**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KEIRA ROSE WEST, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| vs. | : | NO.   20-cv-5649 |
| | : | |
| ANDREW SAUL, | : | |
| Commissioner of Social Security, | : | |
| Defendant. | : | |

<u>**MEMORANDUM OPINION**</u>

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                    **November 8, 2022**

Plaintiff Keira Rose West brought this action seeking review of the Acting Commissioner of Social Security Administration's decision denying his[1] claim for Supplemental Security Income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381–1383f.  This matter is before me for disposition upon consent of the parties.  For the reasons set forth below, Plaintiff's Request for Review (ECF No. 14) is **DENIED**.


**I.     PROCEDURAL HISTORY**

Plaintiff filed for SSI, alleging disability since August 1, 2018, due to mental illness, depression, anxiety and autism.  (R. 230).  Plaintiff's application was denied at the initial level, and he requested a hearing before an Administrative Law Judge (ALJ).  (R. 139-46).  Plaintiff, represented by counsel, and a vocational expert testified at the October 10, 2019 administrative hearing.  (R. 96-126).  On December 26, 2019, the ALJ issued a decision unfavorable to Plaintiff.  (R. 78-94).  Plaintiff appealed the ALJ's decision, and the Appeals Council denied

---

[1]  "[P]laintiff has gender dysphoria and identifies as being male."  (Pl.'s Br., ECF No. 14, at 2 n.2).

Plaintiff's request for review on September 18, 2020, thus making the ALJ's decision the final decision of the Acting Commissioner for purposes of judicial review.  (R. 1-7).

On November 12, 2020, Plaintiff filed a complaint in the United States District Court for the Eastern District of Pennsylvania.  (Compl., ECF No. 1).  On November 16, 2020, Plaintiff consented to my jurisdiction pursuant to 28 U.S.C. § 636(C). (Consent Order, ECF No. 4).  On October 8, 2021, Plaintiff filed a Brief and Statement of Issues in Support of Request for Review.  (Pl.'s Br., ECF No. 14).  On November 8, 2021, the Acting Commissioner filed a Response, to which Plaintiff filed a Reply on December 22, 2021.  (Resp., ECF No. 18; Reply, ECF No. 21).

## II.      FACTUAL BACKGROUND

The Court has considered the administrative record in its entirety and summarizes here the evidence relevant to the instant request for review.

Plaintiff was born on October 20, 1998, and was 20 years old on the alleged disability onset date.  (R. 226).  He graduated from high school in a gifted program and attended some community college.  (R. 104-05, 231, 405).  Plaintiff previously worked as a retail stocker and education tutor.  (*Id.*).

### A.      Medical Evidence

On February 4, 2016, Plaintiff was referred to Central Montgomery Mental Health as part of his Individualized Education Plan (IEP) "[i]n order to succeed more at home, mostly in relationship with Mother."  (R. 691).  The intake assessment indicates diagnoses for mild autism, depression, anxiety, "borderline traits" and a history of cutting, with the last instance in July 2015.  (*Id.*).  Prescriptions for Lexapro, Abilify, Topomax and Xanax were noted.  (R. 696).  A psychological evaluation from July 2016 noted a December 2014 through November 2015 partial

hospitalization, a March 2016 hospitalization after an overdose of medication, and a May 2016 inpatient hospitalization after Plaintiff told his therapist that he wanted to hurt himself, although Plaintiff described it as "a bid to get into a partial program."  (R. 704, 706; *see also* R. 383-404). In July 2019, Plaintiff was noted to be compliant with medication and to have a stable mood.  (R. 747).  Plaintiff returned in October 2019 to facilitate the transition to adult support services once he turned 21 at the end of the month.  (R. 715).  Another prior partial hospitalization in 2017 was also noted.  (*Id.*; *see also* R. 405-13).  Plaintiff reported a "much more stable mood in the last several years" although with a recent resumption of cutting without suicidal intent after no cutting for a year.  (R. 715).  While treating at Central Montgomery Mental Health, Plaintiff repeatedly had normal mental status examinations.  (R. 718, 725, 729, 731, 733, 735, 737, 739, 743, 745).

Plaintiff received psychological evaluations in January and July 2017 from Child and Family, Focus, Inc., in Valley Forge, Pennsylvania, to evaluate the appropriate level of behavioral healthcare.  (R. 592-93, 617).  Diagnoses for major depressive disorder, autism spectrum disorder and generalized anxiety disorder were noted, as were two prior suicide attempts, recent self-cutting and an instance of stabbing himself with a pencil.  (R. 592, 594). Plaintiff expressed a long-term goal of earning a doctorate and becoming a professor in political science or English.  (R. 596).  He discussed having a poor relationship with his mother, but that he gets along well with peers and has a few close, supportive friends.  (R. 598).  Plaintiff was reevaluated on January 12, 2018, to determine whether there was a need for continued services, although it was also noted that he was struggling in his current program.  (R. 603, 606).  The evaluator noted difficulties "with differentiating legitimate mental health issues from Henry [Plaintiff's preferred masculine name] using his diagnoses and symptoms as possible excuses for avoiding responsibility."  (R. 606).

On February 11, 2019, State agency psychological consultant Richard Small, Ph.D., opined that Plaintiff was moderately limited in maintaining attention and concentration for an extended period, interacting with the public, and accepting instructions and responding appropriately to criticism from supervisors.  (R. 134-35).  He further determined that Plaintiff is not significantly limited in any other area of mental health functioning.  (*Id.*).  The reasons for his findings included Plaintiff's high school education, with emotional support in an IEP; enrollment in college classes after a transitional year; past work as a tutor for three years; and activities of daily living (ADLs) including using public transportation, shopping, making simple meals, cleaning and socializing with friends, albeit with some isolation and difficulty focusing. (R. 136).

Plaintiff presented to Christina Wohleber, PsyD, at CW Psychological Services on May 22, 2019, with anxiety, depressed mood and energy, and impulsivity, all rated as "mild."  (R. 641).  Positive relationships with his father and siblings and a poor relationship with his mother were noted.  (R. 643).  At their weekly visits, Plaintiff and Dr. Wohleber often discussed Plaintiff's relationship with his family, coping strategies for his mental health issues, and his gender dysphoria, including legally changing his name, "top surgery" and how to pay for it.  (R. 641-89).  At a June 28, 2019 visit, Plaintiff also noted an intention to resume work shortly and "discussed impact working had on him and how he took on too much with work and school at the same time."  (R. 658).  On August 17, 2019, Plaintiff reported "working on becoming more consistent with being responsible in order to move forward with surgery."  (R. 684).  At the following visit, Plaintiff reported being excited to resume college classes, although he subsequently reported suffering a panic attack in class.  (R. 678, 681).

On December 12, 2019, Plaintiff presented to Onward Behavioral Health in Radnor, Pennsylvania.  (R. 43).  He explained his reason for the visit as: "I just feel like I have a pretty

expansive history of [mental health] issues, and though  it's been better recently, I noticed a decrease in my general quality of life and mood and wanted to nip it in the bud."  (R. 43).  He cited a dip in his grades, a panic attack, 12 to 14 hours of sleep nightly without feeling rested, passive suicidal thoughts, and an instance of self-harm without any for the prior year.  (*Id.*).  He indicated that he was pursuing disability benefits but also that his employable skills included "very good reading and writing, maybe freelance writing."  (R. 52).  The evaluator elaborated on Plaintiff's mental status findings: "Affect incongruent with reported depressive symptoms, appears somewhat attention-seeking."  (R. 58).  Three to six weeks of intensive outpatient mental health therapy were recommended.  (R. 64).  In group therapy sessions in December 2019 and January 2020, Plaintiff was goal-oriented and cooperative, participated actively, and showed insight, but was also repeatedly described as "rambling" and "attention-seeking."  (R. 13-40, 67-77).  One record further indicates that he "knowingly missed a couple of doses of medication lately" in an apparent effort to get attention.  (R. 68).

B.      **Non-Medical Evidence**

The record also contains non-medical evidence.  On January 8, 2019, Plaintiff completed an Adult Function Report.  (R. 255-63).  He indicated that his impairments limit the speed with which he can complete tasks and make attendance difficult.  (R. 255).  He described spending his days reading, writing, playing video games, surfing the internet, caring for his cat (i.e., giving her food, water and attention), sleeping, occasionally preparing simple meals, and, with reminders, washing dishes, doing laundry, and tidying up.  (R. 256-57, 259).  He indicated that he wanted to return to school in the summer.  (*Id.*).  He reported sleep irregularities including nightmares, sleep disruptions and oversleeping when depressed.  (*Id.*).  He claimed to forget to feed himself but endorsed no other difficulties with personal care, except that he needs alarms and sometimes a parent's help to remember to take medications.  (*Id.*).  Plaintiff stated that he goes outside a few

5

times per week and that he can walk, ride in a vehicle, and use public transportation alone.  (R. 258).  He explained that he "never got around to" obtaining his driver's license.  (*Id.*).  He shops once per week in stores and/or online for clothes and food and can count change and manage a savings account, but he "never learned" to pay bills or manage a checking account.  (*Id.*).  He socializes with others daily and described oscillating between isolation and being "clingy."  (R. 259).  He checked boxes indicating difficulty with completing tasks, getting along with others, and concentrating, although he indicated that he could do this latter activity for between 50 and 60 minutes at a time.  (R. 260).  Plaintiff can follow written instructions "well enough" but needs to write down oral instructions.  (*Id.*).  He can generally get along with authority figures and handle stress and has never been fired or laid off from a job due to an inability to get along with others, but he does not handle stress well.  (R. 261).

On June 15, 2019, Plaintiff's former work supervisor for six weeks, Diana Polec, completed an Assessment on a form provided by Plaintiff's counsel.  (R. 636-40).  She checked boxes indicating that Plaintiff had no useful ability or was unable to meet competitive standards in every area of work-related function and that every type of work demand would cause Plaintiff stress.  (R. 635-39).  She checked additional boxes indicating that Plaintiff was unable to perform work he found uninteresting for an extended period and that this inability was the result of his conditions.  (R. 639).  In the section where Ms. Polec was asked to explain this observation, she wrote, "N/A."  (*Id.*).  She predicted that Plaintiff's impairments would "frequently" (between one- and two-thirds of a workday) interfere with his ability to perform simple work tasks and that he would miss more than four days per month due to his symptoms.  (R. 640).  She indicated that Plaintiff could not maintain competitive full-time employment due to his "short attention span, lack of self-confidence and skills needed to be successful."  (*Id.*).

On January 21, 2020, Ms. Polec also completed an "Evaluation of Work" for Plaintiff.

(R. 40-41). In this document, Ms. Polec noted that Plaintiff returned to work for approximately two-and-a-half months. (*Id.*). During this period, she observed that Plaintiff had trouble multitasking, completed little if any work, often did not take his medications or eat, refused to use a public restroom, frequently forgot to clean up his work area, engaged in poor planning, stressed others, showed a lack of independence, frequently missed work, and had trouble staying on task. (*Id.*).

At the administrative hearing on October 10, 2019, Plaintiff testified that he would receive his high school diploma by the following week and that he had previously been held back due to "mental health stuff." (R. 104). He reported currently participating in job training for a reception position five hours per week and attending two classes at community college, for public-speaking and design. (R. 105). He explained pursuing a degree in global studies at the time but planned to transfer and major in English or library studies. (*Id.*). He stated that he takes classes four days per week and normally takes the bus, after his case manager "forced" him to learn how to do so. (R. 105, 114). Plaintiff reported sometimes having panic attacks due to the length of his four-hour art class and that he dropped his entire community college course load due to depression in the fall of 2018. (R. 110-11). He explained that at job training he often completes his work quickly and poorly or, if he completes it properly, he takes a long time. (R. 111). He testified to working for one month at Target in 2018 as a stocker and occasional cashier until he was terminated for being too slow and for leaving frequently due to panic attacks. (R. 106-07). Plaintiff stated that during panic attacks, which occur multiple times per week, he sometimes scratches his arm with mechanical pencils or kitchen instruments. (R. 112). He claimed that these panic attacks are brought on by people yelling at him, being in public or sometimes for no reason. (*Id.* at 112-13). He also testified to loss of interest, tiredness, excessive sleep, suicidal thoughts lasting less than an hour, loss of appetite and lack of

7

engagement in social activities.  (R. 113-14).

Plaintiff indicated that he sees his therapist and case manager weekly and attends "mental management" quarterly.  (R. 107).  He claimed to be unable to work due to panic attacks brought on by "high stress situations," which cause him to "often abscond from situations . . . ."  (R. 108).  He noted that he does homework and sometimes helps with laundry, dishes, and cleaning, but that he forgets to change clothes, shower, brush his teeth, or take medication.  (R. 109-10, 114-15).  Plaintiff reported enjoying reading but stated that he lacks the mental energy to do it. (R. 115).  He explained that he has two friends that he contacts regularly but that he lost other friends due to "decreased social functioning."  (R. 117).  He also claimed to deal with stress "terribly."  (R. 114).

The record also contains Plaintiff's educational records.  Plaintiff received both emotional support and gifted services pursuant to an IEP.  (R. 478).  In May 2018 he was noted to be anxious in math class often, but an "enthusiastic and a valuable contributor" when participating in his college-level English class.  (R. 488-89).  Plaintiff had the ability to advocate for himself and others but withdrew in uncomfortable situations.  (R. 491).  He occasionally required redirection when preoccupied and rushed assignments without checking his work.  (*Id.*). It was further noted that he had a goal of obtaining competitive employment and living independently post-graduation.  (R. 493-94).  Identified strengths included advanced intellectual ability and valuable discussion comments in reading class; independent work for short periods in math class; and work skills including organization of thought and written expression and participation in classroom discussion.  (R. 495).  Under the heading "social skills," Plaintiff was described as "friendly, good sense of humor, outgoing, polite, helpful, enjoys preferred peer interactions."  (*Id.*).  Ongoing functional needs included "continued improvement in managing . . . emotions using coping strategies provided," issues stemming from the

"[a]voidance of non-preferred tasks and subjects," and the need to independently initiate coping strategies.  (*Id.*).

### III.    ALJ'S DECISION

Following the administrative hearing, the ALJ issued a decision in which she made the following findings:

1.    The claimant has not engaged in substantial gainful activity since November 9, 2018, the application date.

2.    The claimant has the following severe impairments: autism spectrum disorder, depressive disorder, anxiety disorder and gender dysphoria.

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: detailed, but involved tasks at a non-production rate pace; is able to perform simple work-related decisions; is able to interact occasionally with supervisors and coworkers; is able to interact rarely with the public (meaning less than occasional, but more than never); is able to tolerate few changes in a routine work setting defined as occasional changes in a routine work setting.

5.    The claimant has no past relevant work.

6.    The claimant was born on October 30, 1998 and was 20 years old, which is defined as a younger individual age 18-49, on the date the application was filed.

7.      The claimant has at least a high school education and is able to communicate in English.

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work.

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.     The claimant has not been under a disability, as defined in the Social Security Act, since November 9, 2018, the date the application was filed.

(R. 81-90).  Accordingly, the ALJ found Plaintiff was not disabled.  (R. 90).


## IV.    LEGAL STANDARD

To be eligible for benefits under the Social Security Act, a claimant must demonstrate to the Commissioner that she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months.  42 U.S.C. § 1382c(a)(3)(A).  A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If she is not, then the Commissioner considers in the second step whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities.  If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of the impairment listed in the "listing of impairments," . . . which result in a presumption of disability, or whether the claimant retains the capacity to work.  If the impairment does not meet the criteria for a listed impairment, then the Commissioner assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform her past work.  If the

> claimant cannot perform her past work, then the final step is to
> determine whether there is other work in the national economy that
> the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. §§ 404.1520(a)(4),

416.920(a)(4).  The disability claimant bears the burden of establishing steps one through four.

If the claimant is determined to be unable to resume previous employment, the burden shifts to

the Commissioner at step five to establish that, given the claimant's age, education, work

experience, and mental and physical limitations, he is able to perform substantial gainful

activities in jobs existing in the national economy.  *Poulos v. Comm'r. of Soc. Sec.*, 474 F.3d 88,

92 (3d Cir. 2007).

    Judicial review of a final decision of the Commissioner is limited.  A district court is

bound by the factual findings of the Commissioner if they are supported by substantial evidence

and decided according to correct legal standards.  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir.

1999).  Substantial evidence is "more than a mere scintilla" and "such relevant evidence as a

reasonable mind might accept as adequate."  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118

(3d Cir. 2000) (citations omitted).  Even if the record could support a contrary conclusion, the

decision of the ALJ will not be overruled as long as there is substantial evidence to support it.

*Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).  The court has plenary review of legal

issues.  *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).


**V.   DISCUSSION**

    In his request for review, Plaintiff raises four issues:

> 1. The ALJ mis-characterized the plaintiff's statements and failed
> to consider the extra help the claimant requires as mandated by 11-
> 2p.
>
> 2. The ALJ failed to properly evaluate the plaintiff's supervisor's

statement on the basis that the supervisor was not a medical provider.

3. The ALJ misinterpreted the "5 day rule" to exclude the opinion of Crystal Valentine.

4. Remand is required because the appointment of Andrew Saul as a single Commissioner of Social Security who is removable only for cause and serves a longer term than the president violates separation of powers, rendering the decision in this case by an ALJ and Appeals Council judges who derived their authority from Mr. Saul constitutionally defective.

(Pl.'s Br., ECF No. 14, at 3-4).

### A.    Consideration of Plaintiff's Need for Extra Help

In his first argument, Plaintiff asserts that the ALJ did not properly consider his reliance on extra help as required by Social Security 11-2p but instead mischaracterized the evidence in concluding that this reliance proves that he only has moderate limitations in interacting with others.  (Pl.'s Br., ECF No. 14, at 4).  The Acting Commissioner responds that Plaintiff incorrectly assumes that there is evidence that he required substantial assistance in functioning or that the ALJ ever made such a finding.  (Resp., ECF No. 18, at 18).  Plaintiff replies briefly that the Acting Commissioner's position is "frankly absurd" because the "[t]he ALJ discusses the extra help."  (Reply, ECF No. 21, at 4).  I agree with the Acting Commissioner.

Social Security Ruling 11-2p, *Title II and XVI: Documenting and Evaluating Disability in Young Adults*, provides in relevant part:

> We consider how independently a young adult is able to function, including whether the young adult needs help from other people or special equipment, devices, or medications to perform day-to-day activities. If a young adult can function only if he or she receives more help than would generally be provided to people without medical impairments, we consider how well the young adult would function without the extra help. The more extra help or support of any kind that a young adult receives because of his or her impairment(s), the less independent he or she is in functioning, and the more severe we will find the limitation to be.

SSR 11-2p, 2011 WL 4055665, at *8 (Sept. 12, 2011).

In relevant part, the ALJ found:

> In interacting with others, the claimant has a moderate limitation.
> The claimant lives with and appears to be close with his father. He
> testified to—and the medical evidence reflects—that he has a good
> relationship with his father and siblings (16F; testimony).
> Although the record shows that he has social anxiety, he makes
> friends easily (16F/1). He takes courses—including one in public
> speaking—and has been able to work with a case manager, job
> trainers and others. He did indicate that he does not interact well
> and isolates himself (5E/6). However, he does not have difficulty
> getting along with authority figures and has never lost a job
> because of problems getting along with others (5E/7). His
> treatment notes describe him as "open and engaging" and
> "friendly" (14F/23).
>
> . . . .
>
> Despite his impairment, the claimant has engaged in a somewhat
> normal level of daily activity and interaction. The claimant
> testified that he is taking two classes—a public speaking and a
> design course— at Montgomery County Community College. He
> is able to use public transportation to get to class. He has been
> getting A's and plans on transferring and pursuing an English
> degree and studying library sciences (17F/2; Testimony). The
> claimant takes care of his pet cat (5E/2). He has some issues with
> personal care, but is self-sufficient after prompting (5E/2;
> testimony). He can prepare his own meals, wash dishes, do laundry
> and tidy up (5E/3). He is able to go out alone and shop (5E/4).
> Some of the physical and mental abilities and social interactions
> required in order to perform these activities are the same as those
> necessary for obtaining and maintaining employment. The
> claimant's ability to participate in such activities undermines the
> claimant's allegations of disabling functional limitations.

(R. 84, 87-88).

According to Plaintiff, these findings invert the meaning of SSR 11-2p because the ALJ

"assume[s] that the fact that the plaintiff can accept, in some instances, extra help must mean that

he has only moderate limitations interacting with others."  (Pl.'s Br., ECF No. 14, at 6).  He

contends that interacting with people such as life coaches, case managers and job trainers with

limited difficulty does not prove that one can interact with those he would encounter in the workplace because the former group of people is likely to have the appropriate "training and temperament" for dealing with those with mental health problems.  (*Id.* at *6, 8).  Similarly, he posits that "[r]equiring reminders, encouragement, and prompting" to carry out activities of daily living (ADLs) is incompatible with maintaining sustained employment and that, in any event, "the ability to perform activities of daily living is a poor measure of the ability to perform work. People do the activities of daily living when they feel up to doing them."  (*Id.* at *6-7).

However, as the Acting Commissioner notes, an analysis under SSR 11-2p was never triggered because the ALJ did not find that Plaintiff "can function only if he . . . receives more help than would generally be provided to people without medical impairments . . . ."  SSR 11-2p, 2011 WL 4055665, at *8.  Instead, he found only that Plaintiff improved with "prompting."  (R. 87).  Without such prompting, Plaintiff would have "some issues with personal care," but the ALJ never found that Plaintiff would be unable to "function."  (*Id.*).  These findings are supported by substantial evidence.  The record appears to contain only two references to Plaintiff receiving prompting or assistance from others.[2]  In his Adult Function Report, Plaintiff indicated that he sometimes needs reminders from parents regarding medication and encouragement and reminders to perform house chores, such as washing dishes and laundry and "tidying up."  (R. 257).  The ALJ considered not only this evidence, but also that Plaintiff has been getting A's at community college, including in his public speaking class; that he has a plan to transfer, study library sciences, and pursue an English degree; that he takes public transportation to class and shops without assistance; and that he cares for his cat.[3]  (R. 87 (citing Exs. 5E/2-4, 17F/2 and

---

[2]  The parties cite only these references, and the Court has uncovered no others in the record.

[3]  Plaintiff points out that he gives the cat food, water and attention, but his father cleans

Plaintiff's testimony)).  Elsewhere in the decision, the ALJ noted that Plaintiff enjoys reading,

writing, playing video games and drawing.  (R. 84-85 (citing Ex. 5E/5, 17F/2)).  Citing a

nonbinding academic study,[4] Plaintiff complains that ADLs generally, and his ADLs in

particular, are poor indicators of the ability to sustain employment, but courts in this circuit

routinely find that the ability to carry out ADLs such as Plaintiff's is compatible with a finding

of not disabled.  *See Brown v. Comm'r of Soc. Sec.*, No. 4:20-CV-2300, 2022 WL 4080773, at *9

(M.D. Pa. Sept. 6, 2022) (going on family vacations, attending welding school, watching

television, playing video games, preparing simple meals, doing laundry, mowing, driving,

shopping in stores, paying bills, counting change and, with reminders, cleaning the bedroom,

taking medication, and letting the dog out); *Henry v. Kijakazi*, No. 4:20-CV-1294, 2022 WL

956278, at *10 (M.D. Pa. Mar. 1, 2022) (caring for a dog, preparing own meals, assisting with

household chores, reading, personal care, playing video games, and going to concerts); *Acosta v.*

*Berryhill*, No. 4:17-cv-01873-MWB-GBC, 2019 WL 1523088, at *4 (M.D. Pa. Feb. 14, 2019)

(personal care, preparing meals, household chores, using public transportation, shopping,

reading, watching television, and managing finances).

Plaintiff's remaining contention is that the ALJ improperly found that Plaintiff has only

moderate limitations in interacting with others based upon his generally positive relationship

with his father, case manager and job trainers.  Citing another academic study,[5] he posits that

---

its litter.  (Pl.'s Br., ECF No. 14, at 6).  However, the Court does not find that this fact is
inconsistent with the ALJ's summary of the evidence or that it meaningfully changes the
analysis.

    [4] National Academies of Sciences, Engineering, and Medicine, *Activities of Daily Living*,
FUNCTIONAL ASSESSMENT FOR ADULTS WITH DISABILITIES 76 (2019), *available at*
https://www.nap.edu/catalog/25376/functional-assessment-for-adults-with-disabilities (last
visited November 7, 2022).

    [5] Bruce G. Link, Ph.D, et al., *Public Conceptions of Mental Illness: Labels, Causes,*

Plaintiff would "have severe problems dealing with supervisors, coworkers or the general public" because they are not likely to have "natural empathy and training for persons with mental health problems."  (Pl.'s Br., ECF No. 14, at 8-9.)  But as the ALJ observed, the record indicates that Plaintiff "does not have difficulty getting along with authority figures and has never lost a job because of problems getting along with others."  (R. 84 (citing Ex. 5E/7).)  Indeed, he "makes friends easily" and, despite his social anxiety, has completed a public speaking class while attending community college.  (*Id.* (citing Ex. 16F/1).)  The ALJ further pointed out that treatment notes describe Plaintiff as "friendly," "open and engaging."  (*Id.* (citing Ex. 14F/23).)  Thus, the ALJ did not base his finding that Plaintiff has a moderate limitation in interacting with others solely on his ability to interact appropriately with his father, case manager and job trainers, as Plaintiff suggests.

Accordingly, the Court declines to remand this matter on the proffered basis.

**B.      Assessment from Plaintiff's Former Supervisor**

Plaintiff claims that the ALJ improperly discounted the Assessment completed by Ms. Polec because she is not a medical provider.  The Acting Commissioner responds that the ALJ appropriately considered the Assessment in light of the limited duration that Plaintiff worked under Ms. Polec while also attempting to pursue his schooling and the Assessment's inconsistency with treatment records.  I agree with the Acting Commissioner that substantial evidence supports the ALJ's findings relative to the Assessment.

Social Security Ruling 16-3p, *Titles II and XVI: Evaluations of Symptoms in Disability Claims*, states in relevant part: "The adjudicator will consider any personal observations of the

---

*Dangerousness, and Social Distance* 89 Am. J. Pub. Health 1328, 1332 (1999), *available at* https://ajph.aphapublications.org/doi/pdfplus/10.2105/AJPH.89.9.1328 (last visited November 7, 2022).

individual in terms of how consistent those observations are with the individual's statements

about his or her symptoms as well as with all of the evidence in the file." SSR 16-3p, 2017 WL

5180304, at *7 (Oct. 25, 2017). As noted in Section II.B, *supra*, Ms. Polec observed that

Plaintiff had no useful ability or was unable to meet competitive standards in every area of work-

related function. (R. 635-38). The ALJ addressed these observations as follows:

> The medical records also include a form completed by Diana
> Polec, who is a non-medical professional who the claimant states
> has known him for a long time and according to the statement
> worked with and/or was the claimant's supervisor for about six
> weeks at a part-time job (13F). The June 2019 statement is found
> unpersuasive as it acknowledges that there are no medical/clinical
> findings that support the assessment since the person who filled out
> the form is not a medical provider. In addition, observation of the
> claimant was only for about six weeks in a work capacity, and as
> acknowledged by the claimant, he was unsuccessful in this
> endeavor as he tried to work and pursue his schooling at the same
> time, and it was too much (14F/18). The longitudinal evidence as
> detailed herein, including mental status examinations in the record
> and mental health treatment notes, provide a much better basis
> upon which to assess the claimant's functional limitations than the
> observations of the lay opinion witness based upon a very brief
> period of time in the context of competing demands of school
> work. As such, the assessment is found unpersuasive as it is
> generally not consistent with the treatment evidence of record.

(R. 88).

Plaintiff distills the ALJ's treatment of the Assessment to "essentially it was lay opinion

and therefore unreliable" and "that the ALJ felt [the record] needed to be from a medical

source." (Pl.'s Br., ECF No. 14, at 12, 14 (citations omitted)). However, this summation omits

the ALJ's findings that Ms. Polec's opinions were also unpersuasive because she only supervised

Plaintiff for six weeks, because he was attempting to juggle work and school at the same time

while working under her, and because her opinions were inconsistent with the medical evidence,

such as Plaintiff's mental status examinations and mental health treatment notes. (R. 88 (citing

Ex. 14F/18)).

After his initial argument that the ALJ rejected Ms. Polec's Assessment because it consisted of lay opinions, Plaintiff next challenges the additional grounds stated by the ALJ. He acknowledges that Ms. Polec supervised him for only "a brief period," but he attempts to explain away this fact by noting that she has also known him since he was a small child. However, Plaintiff does not explain how her personal relationship with Plaintiff as a child and adolescent would position her to opine on his ability to function as an adult in a work-setting. Similarly, Plaintiff attempts to minimize the significance of his attending high school while working by noting that the underlying medical record cited by the ALJ states only that Plaintiff "discussed impact working had on him previously and how he took on too much with work and school at the same time." (R. 658). But the Court fails to see, and Plaintiff does not explain, how this record is not substantial evidence for the ALJ's nearly identical finding that, "as acknowledged by the claimant, he was unsuccessful in this endeavor as he tried to work and pursue his schooling at the same time, and it was too much."[6] (R. 88). Nor does the Court agree that the ALJ's finding lacks supporting substantial evidence because at the time of the hearing he was attending job training five hours per week and taking two community college classes. (R. 104-05).[7]

Finally, Plaintiff asserts that Ms. Polec's lay opinions were consistent with records from Plaintiff's psychologist, Dr. Wohleber, noting that Plaintiff was late to appointments, anxious, distracted, compulsive and restless and demonstrated flight of ideas, fast speech, and difficulties

---

[6] Indeed, even Plaintiff acknowledges that the record could be construed as "saying that it [going to school while working] was a contributing factor" in his inability to maintain the job. (Pl.'s Br., ECF No. 14, at 13).

[7] Plaintiff posits that "the difference would appear to be that the job training is an accommodation program and the work he was doing for Ms. Polec was not," but he fails to explain how five hours of weekly job training is necessarily as or more rigorous than maintaining an actual part-time job. (Pl.'s Br., ECF No. 14, at 13).

with stress tolerance and impulse control.  (Pl.'s Br., ECF No. 14, at 13-14).  However, Plaintiff

ignores that, as the ALJ found, Dr. Wohleber's records also showed only mild to moderate levels

of distress or impairment, fair attention and concentration, intact memory, increasingly stable

mood, unremarkable recent mental status examinations, and medication compliance.  (R. 87

(citing Exs. 14F, 16F/25, 28-29, 57)).  In addition, the ALJ noted that medical evidence from

other sources also found no more than moderate limitations in any area of mental health

functioning.  (R. 88 (citing Ex. 2A)).  The ALJ was entitled to credit this evidence showing

greater functioning over the evidence cited by Plaintiff.  The fact that the record might also have

supported a finding of disabling limitations is not a basis for remand.  *See Simmonds*, 807 F.2d at

58 ("While there is other evidence in the record that could support a finding of disability . . . , our

inquiry is not whether the ALJ could have reasonably made a different finding based on this

record.  Rather, we must review whether the ALJ's actual findings are supported by substantial

record evidence.").

### C.      Exclusion of Evidence Under the Five-Day Rule

The parties dispute whether the ALJ's exclusion of the medical opinion of Plaintiff's

therapist, Crystal Valentine, pursuant to the "five-day rule" set forth in 20 C.F.R. §§ 404.935(a),

416.1435(a) warrants remand.  I agree with the Acting Commissioner that it does not.

The five-day rule states:

> When you submit your request for hearing, you should also submit
> information or evidence as required by § 404.1512 [or § 416.912]
> or any summary of the evidence to the administrative law judge.
> Each party must make every effort to ensure that the administrative
> law judge receives all of the evidence and must inform us about or
> submit any written evidence, as required in § 404.1512 [or §
> 416.912], no later than 5 business days before the date of the
> scheduled hearing. If you do not comply with this requirement, the
> administrative law judge may decline to consider or obtain the
> evidence, unless the circumstances described in paragraph (b) of
> this section apply.

20 C.F.R. §§ 404.935(a), 416.1435(a).

In relevant part, the paragraph (b) exceptions include:

> If you have evidence required under § 404.1512 [or § 416.912] but
> you have missed the deadline described in paragraph (a) of this
> section, the administrative law judge will accept the evidence if he
> or she has not yet issued a decision and you did not inform us
> about or submit the evidence before the deadline because:
>
> . . . .
>
> > (3) Some other unusual, unexpected, or unavoidable
> > circumstance beyond your control prevented you from
> > informing us about or submitting the evidence earlier.
> > Examples include, but are not limited to:
> >
> > . . . .
> >
> > > (iv) You actively and diligently sought evidence
> > > from a source and the evidence was not received or
> > > was received less than 5 business days prior to the
> > > hearing.

20 C.F.R. §§ 404.935(b)(3)(iv), 416.1435(b)(3)(iv).

On October 8, 2019, two days prior to the administrative hearing, Plaintiff's counsel

submitted an Assessment from Plaintiff's therapist, Crystal Valentine, L.S.W. dated October 7,

2019.  (*See* Assessment, ECF No. 16, at 4-10).  After agreeing to hold the record open for three

weeks for counsel to submit certain outstanding evidence referenced in the file, the ALJ engaged

in the following exchange with counsel regarding Ms. Valentine's Assessment:

> ATTY: There was also, Judge, an assessment submitted by Crystal
> Valentine, dated October 7th that's in case documents but not
> exhibited.
>
> ALJ: Well, it's not exhibited because it wasn't part of the five-day
> letter.
>
> ATTY: Well, it didn't exist. It's dated October 7th, so it was
> submitted to you as soon as it was received by my office.

ALJ: It was submitted less than five days before the hearing. So, why should I accept it five business days prior to the hearing?

ATTY: Well, I couldn't have notified you about it, Judge. It was [not] (sic) in existence. So, I couldn't tell you it was part of my five-day letter that this was in existence. So, it was submitted--

ALJ: This is a person who treated him at Central Behavioral Health.

ATTY: The mobile therapist. So, through CBH.

CLMT: It was the child and family focus.

ATTY: She's the child and family?

CLMT: Yes.

ALJ: Well, it (sic) says that they began to work with this individual in -- September 30th, 2016 and they did that up -- through -- up until December 2018. So, it's not as if the Claimant didn't know about this individual long before five business days prior to the hearing. So, I'm still left with why would I accept this late Medical Source Statement?

ARTY: Well, they're not treatment notes, Judge. So -- but --

ALJ: It's an opinion though that you want put into evidence for me to consider in the case.

ATTY: Correct, but the document that I am submitting is not -- was only in existence as of October 7th.

ALJ: No, no. I -- no. The thing is, is this person is attempting to give an opinion that is -- that you want submitted into evidence less than five business days prior to the hearing when in fact they treated the Claimant at least two, three years prior. So, the Claimant and/or the representative should have known about this person and if they wanted an opinion from them, had a duty to submit it timely, and it was not submitted timely, so I'm not admitting it.

(R. 100-02).

The ALJ further explained in his decision:

The claimant submitted or informed the Administrative Law Judge

about additional written evidence less than five business days before the scheduled hearing date. The undersigned finds that the requirements of 20 CFR 404.935(b) and 416.1435(b) are not satisfied and does not admit this evidence into the record. The medical source statement of social worker Crystal Valentine is not admitted into evidence because the undersigned was not informed about the same at least five business days prior to the hearing, and none of the exceptions to the five-day rule apply. This is especially true since the claimant treated with this person going back to 2016, she was known and/or should have been known to the claimant and his representative well in advance of the hearing, and there was nothing submitted prior to the hearing or stated at the hearing to explain why the opinion of the social worker could not have been timely submitted.

(R. 81).

Invoking the above-mentioned exception to the five-day rule under 20 C.F.R. §§ 404.935(b)(3)(iv), 416.1435(b)(3)(iv), as well as guidance placing records of "ongoing treatment" within the ambit of this exception, *see* 81 Fed. Reg. 90987, 90994-95 (Dec. 16, 2016), Plaintiff argues that it was not possible for him to produce the Assessment or inform the ALJ of its existence earlier because the evidence "did not yet exist." (Pl.'s Br., ECF No. 14, at 18). The Acting Commissioner responds that there is no reason that Plaintiff could not have informed the ALJ of the Assessment in his prehearing letter setting forth the anticipated evidence not yet received. (Resp., ECF No. 18, at 21; *see also* R. 287-88 (prehearing letter)). The Acting Commissioner points out that the Assessment is on a form supplied by Plaintiff's earlier administrative counsel and, thus, current "counsel could have informed the ALJ when this was solicited or of her intent to solicit this report, even if it was unknown if or when the provider would respond." (Resp., ECF No. 18, at 22 n.2). In his reply, Plaintiff maintains that it was "impossible" to provide or reference the document earlier. (Reply, ECF No. 21, at 5).

Courts in this circuit have upheld ALJ decisions excluding medical opinions under similar circumstances as those here. For example, in *Shuey v. Berryhill*, counsel for the claimant

requested an RFC assessment from his treating psychiatrist one month in advance of the hearing but did not receive it until after the five-day cutoff had passed.  No. 1:18-CV-00626, 2019 WL 1303201, at *5 (M.D. Pa. Feb. 28, 2019), *report and recommendation adopted by* 2019 WL 1299272 (M.D. Pa. Mar. 21, 2019).  Accordingly, although counsel submitted the assessment promptly upon receipt, he did not do so in compliance with the five-day rule.  *See id.*  Thus, the ALJ refused to admit the evidence at the hearing, noting that counsel had never informed her "that he was having difficulty sourcing or obtaining evidence for the hearing, nor did [claimant] disclose the efforts taken to obtain the evidence sought."  *Id.*  On appeal, the court explained that "[a] claimant's receipt of documents from a medical source less than five business days before a hearing is not by itself sufficient to establish unusual, unexpected, or unavoidable circumstances beyond the claimant's control."  *Id.* (collecting cases).  Significantly, the court held that the delay in receiving the assessment "does not explain counsel's failure to inform the ALJ about the opinion earlier."  *See id.* (observing that 20 C.F.R. § 404.935(b)(3) allows for acceptance of untimely submitted evidence where "unusual, unexpected, or unavoidable circumstance beyond your control prevented you from *informing us* about or submitting the evidence earlier") (emphasis in original).  Therefore, the court declined to disturb the ALJ's decision.  *Id.* at *6.

Similarly, in *Guyer v. Saul*, counsel for the claimant first requested an RFC evaluation from the claimant's doctor upon the scheduling of the hearing.  No. 3:18-CV-01931, 2020 WL 497286, at *1 (M.D. Pa. Jan. 15, 2020), *report and recommendation adopted by* 2020 WL 504658 (M.D. Pa. Jan. 30, 2020).  Four days prior to the hearing, counsel for the claimant informed the ALJ about the anticipated forthcoming evaluation, which was undertaken by the doctor the day before the hearing and then immediately submitted to the ALJ via counsel.  *Id.* at *5-6.  The ALJ rejected the assessment, referencing delays in attempting to obtain it and counsel's untimely notice of the document's existence.  *Id.* at *5.  Citing *Shuey*, the court

reasoned that the claimant had failed to establish "unusual, unexpected, or unavoidable circumstances beyond the claimant's control" and observed that he had adequately explained neither the delay in obtaining the document nor the "failure to *inform* the ALJ about the opinion earlier," even though it had not been existed at the five-day cutoff.  *Id.* at *7 (citations omitted) (emphasis in original).  Accordingly, the court denied the request for remand.  *Id.*

Next, Plaintiff notes that the examples of "unusual, unexpected, or unavoidable circumstances beyond the claimant's control" set forth in 20 C.F.R. §§ 404.935(b)(3), 416.1435(b)(3) are "not exhaustive."  (Pl.'s Br., ECF No. 14, at 19).  He contends that "[f]ailure to inform the ALJ about evidence not in existence 5 days prior to the hearing should be included" within this exception because doing so would be consistent with the five-day rule's stated purpose of improving accuracy and efficiency, as well as the general fairness and workability required of the Social Security system.  (*Id.* (citing 81 Fed. Reg. at 90987, 90989)).  However, Plaintiff's vaguely supported argument runs counter to the holdings of *Shuey* and, in particular, *Guyer*, where the record at issue was not in existence five days prior to the hearing but the court nonetheless upheld the ALJ's decision to exclude it because the claimant did not explain the failure to obtain and produce the document timely.  *Guyer*, 2020 WL 497286, at *7; *cf. Shuey*, 2019 WL 1303201, at *5 (noting that counsel received the document after the five-day cutoff but not specifying when it was actually generated).

Plaintiff cites two out-of-circuit cases for the proposition that this case should be remanded pursuant to the exception in 20 C.F.R. §§ 404.935(b)(3)(iv), 416.1435(b)(3)(iv).  (Pl.'s Br., ECF No. 14, at 19-20 (citing *Long v. Comm'r of Soc. Sec.*, No. 1:20-cv-1490, 2021 WL 2530216 (N.D. Ohio June 21, 2021); *Janet R. v. Comm'r of Soc. Sec.*, 1:19-CV-1100, 2021 WL 1054369 (W.D.N.Y. Mar. 19, 2021))).  However, *Long* is distinguishable because in that case, the claimant fulfilled the "actively and diligently" requirement of the exception by "specifically

24

ask[ing] the records custodian to rush delivery of the records . . . ."  2021 WL 2530216, at *5.

Here, despite the submission of a declaration from the attorney who obtained the Assessment

from Ms. Valentine, no representations about expediting or following up regarding production of

the record have been made.[8]  (*See* Portnoy Decl., ECF No. 16).  Instead, the attorney merely

states, "I did not see, or become aware of the existence of this document until October 7,

2019 . . . ."  (*Id.* at ¶ 5).  But this statement does not establish diligence.

In *Janet R.*, the ALJ refused to accept a medical opinion provided to counsel and, in turn,

the ALJ on the day of the hearing because the opinion was authored after the five-day cutoff.[9]

2021 WL 1054369, at *5.  On appeal, the district court rejected this reason because, unlike in the

instant matter, the ALJ "did not really explain her reason for not considering the evidence."  *Id.*

at *6; *see also Guyer*, 2020 WL497286, at *7 (noting that "there are cases in which reversal is

mandated where an ALJ has failed to address an exception to the five-day rule," such as for

---

[8]  In a footnote, Plaintiff states that "to save time" he submitted this declaration with the attached Assessment in lieu of moving pursuant to 42 U.S.C § 405(g) to compel the Acting Commissioner to file the Assessment as a supplement to the record.  (Pl.'s Br., ECF No. 14, at 15 n.11; *see also* Reply, ECF No. 21, at 6 ("this was certainly a less time consuming approach that [sic] moving this Court to compel a more complete record")).  He claims that, in the first instance, however, "the ALJ should have marked the proffered evidence as an exhibit, as any offer of proof by a claimant should be part of the record, even if not accepted for consideration." (Reply, ECF No. 21, at 6; *see id.* at 6 n.3 ("If the agency is going to require something to be submitted then it should be exhibited, even if not considered for purposes of making an adjudication.")).  But Plaintiff does not explain how he would be in a different position if the Assessment had been made a part of the record, either by the ALJ or the Acting Commissioner, if the ALJ nonetheless refused to consider it pursuant to the five-day rule.

[9]  Additionally, the ALJ excluded the opinion because the five-day letter allegedly indicated that it would come from a different doctor, but the court found this purported fact "irrelevant" because both physicians treated the claimant and were employed at the same practice and because she "presumably had no control over which doctor completed the form." *Janet R.*, 2021 WL 1054369, at *5.  The court also noted that that the signature on the form was illegible and might have come from the physician referenced by the claimant in the letter.  *Id.* at *3.  In any event, the mere fact that the claimant attempted to identify the forthcoming opinion in the five-day letter further distinguishes *Janet R.* from this case.

"unusual, unexpected, or unavoidable circumstance") (citing *Razey v. Comm'r of Soc. Sec.*, No. CV 19-04-E, 2019 WL 4451082, at *4 (W.D. Pa. Sept. 17, 2019)).  Moreover, the court found that the claimant's attorney had shown "that he had actively and diligently sought [the opinion]," for example, by having followed up on the request for the document while awaiting its creation and production.  *Id.* at *5-6.  Again, no similar showing has been made in this case.  (*See generally* Portnoy Decl., ECF No. 16).

Lastly, Plaintiff observes that in 2017 when the Social Security Administration adopted 20 C.F.R. § 416.912, regarding the apportionment of responsibility for obtaining and providing evidence relevant to a claim, it repeatedly stated that it considers "all evidence" that it receives. (Pl.'s Br., ECF No. 14, at 20 (citing 82 Fed. Reg. 5844 (Jan. 18, 2017))).  He extrapolates from this fact that the adoption of this regulation, which postdated the 2016 adoption of the five-day rule, must have "voided the five day rule, *sub silentio*," or else the rule "contains a curious anomaly [sic] as it really requires claimants to submit everything they get but allows the agency to use only evidence that will support a denial of their claim."  (*Id.* at 21).  However, nothing in the cited authority indicates any intention to alter the five-day rule in any way.  *See* 82 Fed. Reg. 5844-01.  Nor does he explain how the purported anomaly allows the administration to selectively consider only evidence negative to a claim, when well-established case law prohibits precisely this practice.  *See Piper v. Saul*, No. 2:18-1450, 2020 WL 709517, at *4 (W.D. Pa. Feb. 12, 2020) ("The ALJ is not entitled to 'cherry pick' favorable evidence and ignore records that run counter to her findings."); *Fanelli v. Colvin*, No. 3:16-CV-1060, 2017 WL 551907, at *9 (M.D. Pa. Feb. 10, 2017) ("[An] evaluation[ ] where the evaluator mentions only isolated facts that militate against the finding of disability and ignores much other evidence  that points another way, amounts to a 'cherry-picking' of the record which this Court will not abide."); *Griffith v. Astrue*, 839 F. Supp. 2d 771, 783 (D. Del. 2012) ("Plaintiff correctly argues that an ALJ is not

permitted to 'cherry-pick' only that that evidence that supports her position."). In any event, despite Plaintiff's criticisms of the five-day rule, there can be no question that it remains in effect even after the subsequent 2017 adoption of 20 C.F.R. § 416.912. *See, e.g., Jorge M. v. Kijakazi*, No. 21-13794, 2022 WL 4536267, at *6 n.5 (D.N.J. Sept. 28, 2022) (noting the continued existence of the five-day rule); *Jones v. Kijakazi*, No. 20-1074-SRF, 2022 WL 1016610, at *10 (D. Del. Apr. 5, 2022) (same).

For these reasons, the Court declines to remand on the basis that the ALJ misapplied the five-day rule.

**D.    Separation of Powers Argument**

Relying upon the Supreme Court's ruling in *Seila Law LLC v. CFPB*, Plaintiff submits that the structure of the Social Security Administration (SSA) is an unconstitutional violation of the separation of powers because its head serves for a longer term than the President (six years) but can only be removed by the President for cause ("neglect of duty or malfeasance in office"). (Pl.'s Br., ECF No. 14, at 21-22 (citing __ U.S. __, 140 S. Ct. 2183 (2020); 42 U.S.C. § 902(a)(3))). He contends that he was deprived of a valid administrative proceeding because former Commissioner Andrew Saul's promulgation of controlling regulations under which the case was decided, as well as his delegation of authority to the presiding ALJ, were constitutionally defective. (*Id.* at 22). He claims that for these reasons his claim was administratively adjudicated under "a presumptively inaccurate legal standard . . . ." (*Id.* at 23). He further argues that any argument that he forfeited a constitutional challenge by not raising it earlier runs afoul of Supreme Court precedent. (*Id.* (citing *Carr v. Saul*, 141 S. Ct. 1352 (2021))).

Citing a 1994 signing statement by President Clinton urging Congress to pass a legislative amendment, as well as President Biden's 2021 termination of prior Commissioner

Andrew Saul pursuant to *Seila Law*, Plaintiff contends that "the government itself . . . has always questioned the constitutionality of SSA's single Commissioner, for cause removal structure." (*Id.* at 23 (citations omitted)).  He insists that the government must explain why it viewed this removal provision, 42 U.S.C. § 902(a)(3), as unconstitutional in 1994 and 2021 but constitutional in this case notwithstanding the absence of any corrective legislation.  (*Id.* at 23-24).  He states that "courts are often reluctant to hold SSA accountable for even admittedly unconstitutional actions," but maintains that the result here should be different because the constitutional defect "exists only because of sustained inaction by the government," that is, the failure to pass a corrective legislative amendment and the former Commissioner's refusal to step down after the issuance of the *Seila Law* decision.  (*Id.* at 24).  He continues: "The government deserves no sympathy and the constitutional rights of poor disability claimants are not somehow less than those of the wealthy attorneys who successfully litigated *Seila Law*."  (*Id.*).  On these grounds, Plaintiff requests a *de novo* hearing before a new ALJ with lawful authority to decide her case. (*Id.* at 25 (citation omitted)).

In response, the Acting Commissioner agrees that Section 902(a)(3) violates the separation of powers but insists that that fact alone does not warrant setting aside a denial of disability benefits.  (Resp., ECF No. 18, at 6).  Citing the Supreme Court case of *Collins v. Yellen*, she asserts that Plaintiff cannot show the required nexus between the provision and the denial of his claim for two reasons.  (*Id.* at 6 (citing 141 S. Ct. 1761 (2021))).  First, she maintains that "the deciding ALJ served under a ratification of her appointment by an Acting Commissioner not subject to Tenure Protection, thus severing any nexus between the removal restriction and Plaintiff's alleged harm."  (*Id.* at 8-9).  She explains that because the President could have removed her at will, at any time, no separation-of-powers concern exists in this case. (*Id.* at 6).  Second, she submits that Plaintiff is unable to show that Section 902(a)(3) caused the

denial of his benefits claim as required by *Collins*.  (*Id.* at 9-12).  On this point, she observes that

unlike instances in which an agency official lacks proper authority to occupy an office due to a

violation of the Appointments Clause, "agency action is not *per se* invalid simply because it can

be traced back to an official subject to an unconstitutional *removal* protection."  (*Id.* at 10 (citing

*Lucia*, 138 S. Ct. 2044 (emphasis in original))).  Instead, she argues that under *Collins* there can

be no argument that the official exercised power he or she did not lawfully possess as long as the

official was properly appointed.  (*Id.*).  Thus, in the Acting Commissioner's view, Plaintiff can

succeed on his removal challenge only if the injuries were caused by an official subject to the

removal restrictions *and* the restrictions themselves "inflict[ed] compensable harm" upon

Plaintiff.  (*Id.* (quoting *Collins*, 141 S. Ct. at 1789)).  This showing, the Acting Commissioner

insists, Plaintiff has not made.  (*Id.* at 22-25).

   As a separate argument, the Acting Commissioner posits that Plaintiff's request for a new

administrative hearing should be denied under the harmless error doctrine, the de facto officer

doctrine, the rule of necessity and "broad prudential considerations."  (Resp., ECF No. 18, at 12-

17).  In his reply, Plaintiff counters that these additional arguments do not apply.  (Reply, ECF

No. 21, at 18-25).

   Plaintiff further replies that his injury is the lack of a constitutionally valid adjudication

and decision, and an unfavorable decision, from both the ALJ and the Appeals Council.  (*Id.* at

7-8).  He accuses the Acting Commissioner of failing to specifically address the actions of the

Appeals Council.  (*Id.* at 8).  Responding to the Acting Commissioner's first reason that Plaintiff

cannot show the required nexus of harm, he insists that he challenges the unconstitutional

delegation of authority to the ALJ and Appeals Council, not whether they had been properly

appointed under the Appointments Clause.  (*Id.* at 10).  Citing *Collins*, he argues that

unconstitutional removal restrictions, like Appointments Clause violations, implicate separation

of powers concerns.  (*Id.* (citing *Collins*, 141 S. Ct. at 1778-89)).  He further claims that "every court which has thus far ruled upon the issue has indicated that even the Acting Commissioner enjoyed removal protection under the statute for the time period of their temporary appointment," contrary to what the Acting Commissioner asserts in her brief.  (*Id.* (citing *Albert v. Kijakazi*, No. 1:21-cv-0004-HRH, 2021 WL 3424268 (D. Alaska Aug. 5, 2021); *Tafoya v. Kijakazi*, 551 F. Supp. 3d 1054 (D. Colo. July 29, 2021); *Dante v. Saul*, No. 20-0702, 2021 WL 2936576 (D.N.M. July 13, 2021))).

Regarding the Acting Commissioner's second reason, he counters that "harm should be presumed" because the matter involves government officials exercising authority that they did not lawfully possess in violation of the separation of powers.[10]  (*Id.* at 12-13 (citing *Collins*, 141 S.Ct. at 1787-89; *Carr*, 141 S. Ct. at 1356-62; *Cirko v. Comm'r of Soc. Sec.*, 948 F.3d 148, 153-54 (3d Cir. 2020); *Landry v. FDIC*, 204 F.3d 1125, 1131 (D.C. Cir. 2000))).  He continues that even if a causal connection is not presumed, he has satisfied this requirement because without the illegal delegation of authority the ALJ and Appeals Council could not have issued their unfavorable determinations.  (*Id.* at 14).  Indeed, he maintains that he can meet a "more strict standard" because it is "unmistakable" that President Biden would have terminated Commissioner Saul immediately upon assuming the presidency had it not been for Section 902(a)(3), as evidenced by the fact that immediately after the *Collins* decision he sought a Department of Justice (DOJ) opinion regarding his authority to remove Commissioner Saul and

---

[10]  Citing *Sims v. Apfel*, 530 U.S. 103 (2020), Plaintiff also argues that harm should be presumed because of "the remedial nature of the agency's programs, along with the agency's *sui generis* informal and non-adversarial structure . . . ."  (Reply, ECF No. 21, at 13).  However, *Sims* did not address this question, but rather whether a Social Security claimant who has exhausted administrative remedies must, to preserve judicial review of the issues, also exhaust the issues in a request for review by the Appeals Council.  *Sims*, 530 U.S. at 107.  Plaintiff fails to explain how this case advances his position.

then terminated him in a statement criticizing his tenure in office upon the issuance of the DOJ

opinion confirming said authority.  (*Id.* at 15-17).  He claims that such "executive level

disapproval of an agency head's actions fits squarely within the majority analysis in *Collins*

setting forth the grounds upon which an aggrieved litigant should be accorded a remedy for a

violation of their constitutional rights when causation is required." (*Id.* at 18).

In *Seila Law*, the United States Supreme Court found that a violation of the constitutional

separation of powers occurs when an executive agency is led by a single head who serves for a

longer term than the president and can only be removed from that position for cause.  140 S. Ct.

2183.  The Acting Commissioner agrees that the relevant provision of the Social Security Act, 42

§ U.S.C. § 902(a)(3), violates the separation of powers to the extent that it limits the President's

authority to remove the Commissioner without cause. (Resp., ECF No. 17, at 18).  However, the

Acting Commissioner argues that this alone does not support setting aside Plaintiff's unfavorable

disability determination because Plaintiff cannot show that the restriction actually caused him

harm.  (*Id.* at 19).

In 2021, the Supreme Court clarified its holding in *Seila* in *Collins v. Yellen*, 141 S. Ct.

1761.  In *Collins*, the Court held that an unconstitutional removal provision does not

automatically render all actions taken by individuals subject to that provision void.  *Id.* at 1787.

The court explained:

> Although the statute unconstitutionally limited the President's
> authority to remove the [individual], there was no constitutional
> defect in the statutorily prescribed method of appointment to that
> office. As a result, there is no reason to regard any of the actions
> taken by the [agency] as void.

*Id.* (emphasis in original).  However, the court also found that "it is still possible for an

unconstitutional provision to inflict compensable harm."  *Id.* at 1789.  In such a case, the plaintiff

must show that the removal restriction was the cause of the harm he suffered.  *Id.*  In the context

of Social Security appeals, "*Collins* requires [the plaintiff] to demonstrate a nexus between the decision denying [his] disability benefits and 42 U.S.C. § 902(a)(3)." *Andino v. Kijakazi*, No. 21-2852, 2022 WL 1135010, at *7 (E.D. Pa. 2022).

Notably, post-*Collins*, all the courts in this circuit that have considered such separation of powers arguments as the one raised here by Plaintiff have agreed, citing *Collins*, that they do not warrant remand. *See, e.g., Andino*, 2022 WL 1135010[11]; *Adams v. Kijakazi*, No. 20-3591, 2022 WL 767806, at *9-11 (E.D. Pa. Apr. 18, 2022); *High v. Kijakazi*, No. 20-3528, 2022 WL 394750, at *6 (E.D. Pa. Feb. 9, 2022); *Wicker v. Kijakazi*, No. 20-4771, 2022 WL 267896, at *8-10 (E.D. Pa. Jan. 28, 2022); *Mor v. Kijakazi*, No. 21-1730, 2022 WL 73510 (D.N.J. Jan. 7, 2022); *Crossley v. Kijakazi*, No. 20-2298, 2021 WL 6197783, at *8 (M.D. Pa. Dec. 31, 2021). Courts in other circuits have also reached the same conclusion. *See, e.g. Shannon R. v. Comm'r of Soc. Sec.*, 572 F. Supp. 3d 1028, 1037-39 (W.D. Wash. 2021); *Alice T. v. Kijakazi*, No. 8:21CV14, 2021 WL 5302141, at *18 (D. Neb. Nov. 15, 2021); *Webb v. Kijakazi*, No. 1:20CV714, 2021 WL 5206498, at *15 at n. 12 (M.D.N.C. Nov. 9, 2021) (Report and

---

[11] *Andino* also distinguished Plaintiff's cases cited in support of his observation that courts have found that the Acting Commissioner enjoyed removal protection under 42 U.S.C. § 902(a)(3) during the period of temporary appointment. It explained:

> Certain courts have rejected 12(b)(6) motions to dismiss Social Security cases based on *Seila Law*, finding that the claimants have standing to challenge unfavorable decisions on the basis of an unlawful removal provision. However, Justice Alito specified in *Collins* that Seila Law's holding on standing "does not mean that actions taken by such an officer are void *ab initio* and must be undone." Thus, these cases do not relieve a claimant of showing harm connected to the unconstitutional removal provision.

*Andino*, 2022 WL 1135010, at *6 (citing *Tafoya*, *Dante* and *Sylvia A. v. Kijakazi*, No. 5:21-CV-M-BQ, 2021 WL 4692293 at *3 (N.D. Tex. Sep. 13, 2021), *report and recommendation adopted* 2021 WL 4622528 (N.D. Tex. Oct. 7, 2021)) (additional internal citations omitted).

Recommendation); *Lisa Y. v. Comm'r of Soc. Sec.*, 570 F. Supp. 3d 993 (W.D. Wash. 2021); *Robinson v. Kijakazi*, No. 1:20-CV-00358-KDB, 2021 WL 4998397, at *2-3 (W.D.N.C. Oct. 27, 2021); *Tracey Ann. P. v. Kijakazi*, No. 20CV1163-LAB(RBB), 2021 WL 4993021, at *18 (S.D. Cal. Oct. 27, 2021) (Report and Recommendation); *Robles v. Comm'r of Soc. Sec.*, No. 220CV01069JDPSS, 2021 WL 4285170, at *4 n. 6 (E.D. Cal. Sept. 21, 2021); *Angelita O. v. Kijakazi*, No. 1:20-CV-00034-AJB, 2021 WL 4146085, at *18 at n. 13 (N.D. Ga. Sept. 13, 2021).

Here, Plaintiff has not shown a nexus between the decision denying his disability benefits and Section 902(a)(3).  Citing cases involving violations of the Appointments Clause, he argues that the ALJ and Appeals Council lacked authority to preside over and issue rulings in his case and that he is entitled to a new hearing with a constitutionally appointed ALJ.  (Reply, ECF No. 19, at 7-8, 11-13).  However, as explained in *Collins*, an unconstitutional restriction upon the President's authority to *remove* agency officers does not create a constitutional defect in the officers' *appointment* such that their actions are rendered void, unlike with a violation of the Appointments Clause.[12]  141 S. Ct. at 1787; *cf. Lucia*, 138 S. Ct. at 2055 ("the appropriate remedy for an adjudication tainted with an appointments violation is a new hearing before a properly appointed official") (citing *Ryder v. United States*, 515 U.S. 177, 183, 188, 115 S. Ct. 2031, 132 L.Ed.2d 136 (1995)) (quotations omitted).

---

[12]  Plaintiff submits that the Acting Commissioner has waived her arguments regarding the actions of the Appeals Council by instead referring only to the ALJ throughout her brief. (Reply, ECF No. 21, at 8).  But as Plaintiff elsewhere observes, the arguments, applicable law and analysis in this matter pertain equally to both the ALJ and the Appeals Council.  (*See* Pl.'s Br., ECF No. 14, at 22-23 ("All of this is just as true with respect to SSA's Appeals Council Judges.")).  Accordingly, this Court declines to reach one result regarding the actions of the ALJ in this matter and another regarding those of the Appeals Council simply because the Acting Commissioner referenced the former and not the latter in her brief.

Plaintiff further argues that the adjudication of his claim by an ALJ and Appeal Council delegated authority by a constitutionally defective Commissioner establishes a presumption of harm and that the ALJ and Appeals Council could not have issued the adverse determination in his case "but for" the Commissioner's unlawful delegation of authority to them.  (Reply, ECF No. 19, at 10, 12).  Nonetheless, the mere delegation of authority by the Commissioner does not constitute a sufficient nexus to satisfy the requirements of *Collins* or *Seila Law*.  In *Collins*, the injury suffered by the plaintiffs was directly traceable to an amendment adopted by the directors of the Federal Housing Finance Agency (FHFA) that materially changed the nature of certain financial agreements. 141 S. Ct. at 1774, 1779.  As a result, the plaintiffs in *Collins* had "an identifiable basis to contend that but for the unconstitutional removal provision, the President may have removed and appointed a different Director who would have disapproved of the adoption (or implementation) of the [amendment.]"  *Lisa Y.*, 2021 WL 5177363, at *7.  But it is not enough for Plaintiff to trace his injury to the Commissioner's ability to delegate power to ALJs and to promulgate applicable rules and regulations; rather, he must be able to trace that injury to the actual unlawful conduct in this matter, which is the unconstitutional removal clause. *See Wicker*, 2022 WL 267896, at *10 (citing *Collins*, 141 S. Ct. at 1779).  Unlike the FHFA Director in *Collins*, the Commissioner did not promulgate a new action affecting or injuring Plaintiff, and there is nothing to indicate that but for the unconstitutional removal clause the President would have removed the Commissioner and appointed a new Commissioner who would have decided Plaintiff's disability claim *differently. See id.* (finding Commissioner's delegation of authority to ALJs and Appeals Council did not constitute sufficient nexus to demonstrate standing under *Collins*).  As a result, Plaintiff has failed to show that the

unconstitutional removal clause caused him harm.[13]

Accordingly, I respectfully recommend that remand on this basis be denied.


**VI.     CONCLUSION**

For the reasons set forth above, Plaintiff's request for review is **DENIED**.  An

appropriate Order follows.


BY THE COURT:

  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge

---

[13]  Because this Court agrees with the Acting Commissioner that Plaintiff's separation of powers argument fails due to Plaintiff's inability to show that the offending removal provision caused the denial of his claim, this Court does not address the Acting Commissioner's remaining arguments or Plaintiff's responses thereto.